UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES F. GRIFFITH, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:17-cv-00194-TWP-MJD |
| F. BRANNICK, <br> D. HASKINS, <br> YARBAR, <br> DEVINE, <br> E. DRADA, <br> N. LYDAY, <br> PHILLIPS, | ) |
| Defendants. | ) |

**ORDER ON MOTION TO SANCTION DEFENDANTS
FOR SPOLIATION OF EVIDENCE[1]**

This matter comes before the Court on *Plaintiff's Motion to Sanction Defendants for Spoliation of Evidence*. [Dkt. 99.] Plaintiff filed his motion on December 6, 2018. [Dkt. 99.] Defendants filed their *Response to Motion for Sanctions, Docket No. 99* on December 11, 2018. [Dkt. 101.] Plaintiff then filed his *Reply* on January 2, 2019. [Dkt. 102.] On March 18, 2019, the Court held an in-person hearing on Plaintiff's motion at the Wabash Valley Correctional

---

[1] The Court will also address *Plaintiff's Verified Notice Regarding the Spoliation of Video Footage from F Cellhouse and Motion for Court to Take Notice of It* [Dkt. 131], filed on March 27, 2019, in this Order. The Court **GRANTS** Docket No. 131 to the extent the Court will take notice that Plaintiff did request preservation of the F cellhouse video footage, further discussed in this Order.

1

Facility ("WVCF"); the Plaintiff appeared in person and Defendants appeared by counsel. After the Court's review of the parties' briefing and the on-location hearing, the Court **DENIES** Plaintiff's motion.

## I. Background

In this action, Plaintiff, a prisoner now incarcerated at New Castle Correctional Facility, brings excessive use of force claims against correctional officer Defendants that he asserts occurred while he was housed at WVCF. [Dkt. 5 at 1.] Plaintiff alleges that on June 2, 2016, Defendants dragged him handcuffed from D cell house to F cell house. [Dkt. 5 at 2.] While Plaintiff was handcuffed, he contends Defendants body slammed, jumped on, and began beating him. [Dkt. 5 at 2.] On June 3, 2016, the Plaintiff was interviewed by Lieutenant Christopher Nicholson during a screening on a Conduct Report regarding the housing reassignment incident. [Dkt. 99-1 at 1.] Plaintiff communicated to Nicholson that Plaintiff had been assaulted by WVCF officers who carried out the bed move. [Dkt. 99-1 at 1.] On June 15 and 16, 2016, Investigator Fernell McDonald interviewed the Plaintiff to discuss the incident and recorded that Mr. Griffith "[didn't] want anything done about it anyway." [Dkt. 99-1 at 3.] Further, McDonald interviewed Officer Brannick and Sergeant Lyday. [Dkt. 99-1 at 3-4.] Defendants contended that the Plaintiff attempted to trip the officers during the escort causing the Plaintiff to fall onto the sidewalk and the officers to fall on top of him. [Dkt. 99-1 at 3.]

On June 21, 2016, the Plaintiff argued he "made it abundantly clear to top level administrative and investigative staff that litigation was imminent, and requested that video and photographic evidence be preserved." [Dkt. 99 at 2.] Plaintiff's motion included Exhibits D, E, F, and G, which are Indiana Department of Correction Request(s) for Interview that Plaintiff submitted to Superintendent Brown, Lieutenant Nicholson, and Internal Affairs personnel Rob

Marshal and Fernell McDonald. [Dkt. 99-1.] Exhibits D through G were submitted by the Plaintiff to each respective party on June 21, 2016, just nineteen days after the incident. [Dkt. 99-1.] In each request the Plaintiff stated the following:

> After giving it some thought I have changed my mind. Accordingly I ask that you **please save all video evidence of the staff escort from D-602 to FHU320** on June 2, 2016 and any use of force used on me at that time. That includes when I was slammed to the ground and beaten.

[Dkt. 99-1.] (emphasis added). On July 14, 2016, the Plaintiff sent additional Request(s) for Interview, as evidenced by Exhibits H, I, J, and K, to Superintendent Brown, Lieutenant Nicholson, ASR-Gilmore, and the Office of Investigations and Intelligence. [Dkt. 99-1.] In these supplemental requests the Plaintiff stated:

> I am writing to notify and request that the video surveil[l]ance videos from D dorm-Center on 6-2-16 from approximately 1:00 p.m. up to 3:00 p.m. be kept/preserved so that they may be used in future court proceedings. I need this length/duration so that it **covers the complete incident and all the actions that led up to the incident** and also to support and/or rebut statements that were made pertaining to the incident.

[Dkt. 99-1.] (emphasis added). Additionally, the Plaintiff issued five separate Request(s) for Interview, Exhibits L, M, N, O, and P to preserve all photographs taken on June 3, 2016, of Plaintiff's injuries and any reports that were produced during the investigation of the incident. [Dkt. 99-1.] On July 26, 2016, the Plaintiff received official correspondence from the Office of Investigations and Intelligence, R. Marshall, to notify the Plaintiff that his requests had been reviewed on July 25, 2016, that all documents "were considered confidential[,]" and that while Plaintiff's request was denied, "all documents will be retained in the Investigations Dept." [Dkt.

99-1, Exh. Q.]  This memorandum of correspondence appears to only be related to Plaintiff's request for "photos and written reports" and does not acknowledge any video footage requests.[2] [Dkt. 99-1.]

During discovery the Plaintiff submitted requests for production on January 31, 2018, which included Request No. 11:

> Copy of all video surveillance which would have observed cell D-602, the dayroom of the dorm, and the route to F dorm during the time of this incident[.]

[Dkt. 99-1.]  On September 4, 2018, Defense counsel showed Plaintiff video footage which Plaintiff contended "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" [Dkt. 99 at 3.]  Plaintiff argued this video "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . [and] is thus, incomplete."[3]  [Dkt. 99 at 3.]  Plaintiff's *Motion to Sanction Defendants for Spoliation of Evidence* asserted that additional video footage "outside of D cellhouse, and showing the route to F cellhouse had to have existed, because Plaintiff had previously seen several cameras outside of the cellhouses, and aiming up and down the sidewalks, which connected all the cellhouses." [Dkt. 99 at 3.]  The Plaintiff argued that through his own daily observations in his two years at WVCF he noticed these cameras and that "if there is nothing further to produce, the video had to have been destroyed."  [Dkt. 99 at 4.]  Defendants' *Response* argued Plaintiff's premise for spoliation was based on "a mistake or misstatement . . . .[t]here was no video to retain."  [Dkt.

---

[2] The Court notes that neither party has included any supplemental exhibits in their briefing to show any correspondence regarding Plaintiff's requests for preservation of the video footage surrounding the incident.

[3] The Court notes Plaintiff's contentions about the incompleteness of the video footage shown to him on September 4, 2018, was an argument addressed in Plaintiff's *Verified Fourth Motion to Compel Discovery*.  [Dkt. 87.]  Defendants' *Response* to Plaintiff's motion to compel unequivocally stated, "There is nothing further to produce."  [Dkt. 91 at 1.]

4

101 at 1.] Defendants further stated that discussion of what video surveillance does or does not actively exist in the maximum-security prison is information best not disclosed to an offender and poses security risks. [Dkt. 101 at 2.]

On March 18, 2019, the Magistrate Judge conducted an in-person hearing at WVCF with the Plaintiff, Defense counsel, and the Warden of the facility. During this hearing, the undersigned walked the outdoor path from D cellhouse to F cellhouse with the parties to observe the location of specific cameras Plaintiff believed to have been able to capture video footage of the incident. During the hearing, Plaintiff acknowledged that ████████████████████ ████████████████████████████. However, counsel for Defendants acknowledged that ████████████████████████████████ and had not been preserved. The Court, in turn, weighs the parties briefing and the in-person hearing held on site at WVCF in its analysis of the Plaintiff's spoliation claim.

## II. Legal Standard

The Plaintiff points to a court's authority to sanction a party for spoliation of evidence pursuant to Federal Rule of Civil Procedure 37 and its inherent authority "to fashion an appropriate sanction for conduct which abuses the judicial process." [Dkt. 99 at 4.] *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 50-51 (1991) (sanctions utilized when bad faith conduct exists in litigation). A court's authority under Federal Rule of Civil Procedure 37 applies in those instances where a party has failed to comply with a court order, though this order need not be "a formal order"; rather, "[a]n agreement or promise between the parties to conduct discovery in particular fashion may constitute an order." *Blasius v. Angel Auto.*, No. 3:13-CV-46-JVB-CAN, 2014 WL 12783287, at *3 (N.D. Ind. Apr. 3, 2014). Though the Court notes that the Plaintiff has raised numerous discovery dispute issues in his multiple motions to compel

information from Defendants, it does not find that the Plaintiff has argued Defendants have violated a court order. Furthermore, the Court finds no evidence the parties explicitly agreed or promised to preserve video evidence; the only documentation provided in context with Plaintiff's spoliation motion was correspondence regarding Defendants assertion to preserve "photos and written reports." [Dkt. 99-1, Exh. Q.] Therefore, the Court finds Rule 37 is not applicable as a basis for sanctions and will in the alternative address Plaintiff's motion based on its inherent authority.

Assessing whether spoliation occurred requires a two-part inquiry. First the Seventh Circuit has noted that "courts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *see also Norman-Nunnery v. Madison Area Tech. Coll.*, 625 F.3d 422, 429 (7th Cir. 2010) (observing that Plaintiff "fail[ed] every element of the test for spoliation inference" where evidence was destroyed "before [defendant] knew or should have known that litigation was imminent"). Thus, any sanction for spoliation must follow a finding that Defendants were under a duty to preserve evidence.

Second, in the Seventh Circuit, a showing of "bad faith" is "a prerequisite to imposing sanctions for the destruction of evidence." *Trask-Morton*, 534 F.3d at 681. "'[B]ad faith' means destruction for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998) (To determine whether "bad faith" exists is a "question of fact like any other, so the trier of fact is entitled to draw any reasonable inference."). The mere showing that "a party intentionally destroyed evidence" does not constitute bad faith. *Blasius*, 2014 WL 12783287 at *5. Sanctions for spoliation thus may not be imposed simply because

6

evidence was destroyed; more precisely, "the crucial element is not that evidence was destroyed but rather the reason for the destruction." *Park v. City of Chi.*, 297 F.3d 606, 615 (7th Cir. 2002). The movant bears the burden to make the showing of bad faith. *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2012).

### III. Discussion

On March 18, 2019, the Plaintiff identified a total of ▮ cameras that he believed existed on the WVCF premises that would have captured video footage of his allegations against Defendants. The Plaintiff pointed out the location of these ▮ cameras while walking the route of his transportation from D cellhouse to F cellhouse. These identified cameras included: ▮

▮

▮

▮. The Magistrate Judge questioned Warden Richard Brown as to the existence, position, and filming capabilities of these identified cameras. The Magistrate Judge confirmed with the Plaintiff that his allegations of excessive force occurred while exiting the vestibule area of D cellhouse and along the outdoor pathway to F cellhouse. The Magistrate Judge questioned Warden Richard Brown and Defense counsel about a ▮

▮

▮. The Court's analysis regarding Plaintiff's spoliation motion will address each of these identified cameras in turn.

**A.** ▮

Defendants did produce ▮

▮. [Dkt. 99 at 3.] At the hearing on

7

Plaintiff's spoliation motion, Plaintiff ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Warden Richard Brown confirmed ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Upon observation of this ▬▬▬▬▬▬▬, Plaintiff conceded that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The Court finds, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, there was no video footage relevant to the Plaintiff's claims that was captured. Defendants cannot preserve and subsequently produce that which does not exist. **Therefore, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, the Court finds there was no spoliation of any such video from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.**

**B.** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

The Plaintiff pointed out ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, as devices able to record the alleged incident that occurred during his transportation between the two buildings. Warden Richard Brown confirmed ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The Plaintiff conceded that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The Court finds, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, there was no video footage relevant to Plaintiff's claims that was captured. Defendants cannot preserve and subsequently produce that which does not exist. **Therefore, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, the Court finds there was no spoliation of any such video from ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.**

**C.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The Magistrate Judge inquired about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Warden Richard Brown confirmed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. When the Court asked why this portion of the video footage was not preserved, Defense counsel responded that this video "was never requested [by the Plaintiff]" and "We can't keep everything." The Plaintiff contended he had requested the preservation of this footage as a part of the entire transaction of his bed move from D to F cellhouse. On March 20, 2019, Defendants filed their *Submission Regarding Video in F Cell House* to supplement Defense counsel's statements made during the hearing on Plaintiff's motion. [Dkt. 128.] In this supplemental filing Defendants argued Plaintiff's July 28, 2017 request for the videos had "a blank certificate of service" and only requested the videos "to F Dorm . . . not inside the building." [Dkt. 128 at 1-2.] On March 27, 2019, Plaintiff filed a *Verified Notice* in which he "moves the Court" to take notice that he did request the F cellhouse video footage through his preservation requests on June 21, 2016. [Dkt. 131 at 1.] Plaintiff's *Verified Notice* also addresses his Request for Production No. 11, asking the Court to take notice that the Plaintiff's request meant "his escourt [sic] from D-602 to F-320" to include the entire transaction and not just the walk outside and between the cellhouses as Defendants would contend. [Dkt. 131 at 2.] The Plaintiff askes the Court to construe language in his Request for Production No. 11 liberally to be inclusive of the entire incident. [Dkt. 131 at 2.] The Court, hereby, **GRANTS** Plaintiff's *Verified Notice and Motion for the Court* [Dkt. 131], to the extent the Court acknowledges the

Plaintiff's assertions that he "unambiguously requested [F cellhouse video on June 21, 2016] be saved for use in future litigation."[4]

**1. Duty to Preserve vs. Duty to Produce**

"A party has a duty to preserve evidence when it knows, or should have known, that litigation was imminent." *Trask-Morton*, 534 F.3d at 681. "At the latest, this duty attaches when the plaintiff informs the defendant of his potential claim." *Chandler v. Buncich*, No. 2:12-CV-175, 2012 WL 4343314, at *1 (N.D. Ind. Sept. 24, 2012). The duty may arise "even prior to the filling of a complaint as long as it is known that litigation is likely to commence." *MacNeil Auto Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 801 (N.D. Ill. 2010). Once the duty of preservation attaches, it imposes a "broad" obligation "encompassing ***any relevant evidence*** that the non-preserving party knew or reasonably could foresee would be relevant to the action." *Chandler*, 2012 WL 4343314 at *1 (emphasis added); *see also MacNeil*, 715 F. Supp. 2d at 800 ("A party has a duty to preserve evidence over which it had control and reasonably knew or could reasonably foresee was material to a potential legal action.").

The Plaintiff notified WVCF officials of his intent to file a lawsuit on June 21, 2016. [Dkt. 99 at 2.] Further, Plaintiff initiated specific preservation requests at that time for "all video evidence of the staff escort" to be saved. [Dkt. 99 at 2.] Within nineteen days of the alleged incident, WVCF officials were on notice of a potential claim to be brought by the Plaintiff; this notification triggered the Defendants' duty to preserve the video footage of the ***entire*** transaction of the Plaintiff's escort under the broad interpretation that any relevant evidence be included in

---

[4] While the Court does also note Plaintiff's supporting assertions that he meant the entire transaction surrounding the housing reassignment incident in his Request for Production No. 11, the Court finds this argument is not needed to establish the Defendants' duty of preservation, as is further discussed by this Order.

10

the Defendants' preservation obligation. Plaintiff again followed up this initial notification with additional requests to WVCF officials on July 14, 2016, well after Defendants' duty to preserve had arisen. [Dkt. 99 at 2.]

In Defendants' *Response*, Defense counsel made a number of statements that invoke the concern of this Court. Such statements include the following: "There was no video to retain. It was not deleted. It never existed. There was no spoliation." [Dkt. 101 at 1.] Defense counsel further asserted that "[t]here was nothing withheld or to withhold . . . no video to submit to the court for in camera review . . . [a]ll video of the incident that exists and that ever existed has been shown to the plaintiff and consists of the video inside the [D] cell house." [Dkt. 101 at 2.]

The Court finds that ███████████████████████████████████ ██████, and thereby, withheld from the Plaintiff. Though Defense counsel attempts to qualify such statements to pertain to the outdoor areas in which Plaintiff's excessive force allegations occurred, the representations to the Court that no other video ever existed were clearly untrue.[5]

Further, Defendants' argument that Mr. Griffith requested only video footage "to" the F Dorm and not "inside the building" is unsatisfactory and meritless. The Court will not engage in parsing out this attenuated contention that Plaintiff's request that Defendants produce a "[c]opy of all video surveillance which would have observed cell D-602, the dayroom of the dorm, and

---

[5] In light of a recent case filed in the Southern District of Indiana, as it pertains to the existence of video footage of incidents surrounding inmate claims asserted against WVCF, the Court further cautions parties from making statements in briefs submitted to the Court that may be construed as misrepresentations. *See Littler v. Martinez, et al.*, No 2:16-cv-00472-JMS-DLP, 2019 WL 4043256, at *1 (S.D. Ind. Mar. 5, 2019) (The Court "expressed grave concerns regarding the truth of sworn statements submitted by defendants" when through the plaintiff's "persistence and court intervention, video evidence and emails were uncovered that cast serious doubt on the veracity of their sworn statements." The Court imposed serious sanctions for the parties' and counsel's misconduct.)

the route to F dorm during the time of this incident" absolved the Defendants' of their duty to preserve all evidence related to the Plaintiff's cause of action.

The Defendants' duty to preserve the relevant evidence from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ is separate and distinct from the parties' duties to produce in compliance with the rules of discovery. Mr. Griffith was not required to specifically request preservation of the video footage surrounding his claim; this duty arose the moment Mr. Griffith informed WVCF officials he had changed his mind about pursuing litigation. At that moment, litigation become "imminent" and the duty to preserve arose. The Court notes that, even though Mr. Griffith was not required to submit an explicit request for this video's preservation, he did in fact request "all video surveillance" be *preserved and produced* through the submission of his June 21, 2016 Indiana Department of Correction Requests for Interview [Dkt. 99-1] and in his January 31, 2018, Request for Production No. 11 [Dkt. 99 at 3]. In the case at hand, Defendants preserved the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. There is little to no excuse why the additional ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was not also preserved in conjunction with this inmate escort to a new housing assignment.

To provide the utmost clarification to the question of when the duty to preserve arises surrounding inmate litigation cases, the Court suggests a bright line rule to prevent further issues of failure to comply with this duty. **The duty to preserve begins at the time an inmate files a grievance with the correctional facility and/or formally submits a request for preservation of evidence by way of submission of an Indiana Department of Correction Request for Interview, whichever may occur first. After that date, all information, to include video evidence, that could be potentially relevant to the inmate's claims MUST BE PRESERVED.**

12

For the foregoing reasons, **the Court finds Defendants did have a duty to preserve video footage that existed from the ▬▬▬▬▬▬▬▬▬▬. Defendants failed to comply with this duty to preserve evidence.**

## 2. Spoliation & Bad Faith

A finding that Defendants had a duty to preserve evidence is only the initial step in a spoliation analysis. The Court must also determine that Defendants acted in bad faith in their deletion of and recording over the ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

The Court acknowledges the tall hurdle that the Plaintiff must overcome to show the bad faith element required to attain sanctions for spoliation. The Court may infer bad faith from the circumstances of the destruction of evidence. *See Mathis*, 136 F.3d at 1155. Had the ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and such footage was not preserved, compounded with Plaintiff's assertions that the excessive force took place in these outdoor locations, the Court would most likely have a different analysis. In that scenario, an inference that the destruction of the video occurred in bad faith to hide adverse information could arguably be made.

However, the Court is not faced with those circumstances here. Rather, the Plaintiff acknowledged during the in-person on site hearing that he requested the video of the entirety of the transaction that took place in the movement of his housing assignment. The Plaintiff contended that his allegations of excessive force occurred during the exit of D cellhouse and in the outdoor areas between the two buildings; Mr. Griffith has never claimed any of these allegations happened upon his entrance into the F cellhouse or on the pathway to his new cell assignment once he was inside F cellhouse. The Court notes that the only evidence the

13

███████ may have shown was the existence and extent of any injuries the Plaintiff received during the escort, whether inflicted by the Defendants or sustained from the trip and fall version of the facts that the Defendants contend took place. The Court finds that Mr. Griffith has additional avenues to show evidence of the existence and extent of his injuries through photographic evidence taken during medical consultation, his medical records, and through his own testimony. Simply because Plaintiff has established there was ███████, the footage from this camera was not provided to him after his requests, and that the footage was not preserved by the Defendants, the Plaintiff does not automatically complete the second step of spoliation to show Defendants destroyed any video due to any potentially damaging information. The Court cannot make a finding of spoliation under these circumstances. *See Bracey*, 712 F.3d at 1019-20 (defendants had a duty to preserve prison videos but plaintiff failed to show bad faith); *Trask-Morton*, 534 F.3d 672, 681-82 (denial of spoliation upheld due to no bad faith element established); *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985) ("documents were destroyed under routine procedures, not in bad faith . . .").

For the foregoing reasons, **the Court finds that though Defendants did not preserve the ███████, Plaintiff has failed to demonstrate that the destruction of the video was committed in bad faith, and as such, no spoliation of evidence occurred.**

### IV. Sanctions

As noted above, sanctions for spoliation of evidence can be entered only if the culpable party destroyed evidence in bad faith. *Trask-Morton*, 534 F.3d at 681. The majority of the cameras Plaintiff asserted could have recorded his claims of excessive force ███████ ███████ ███████. The only remaining video footage in question concerned that of the ███████

14

███████████. The Court finds that the Plaintiff has not met his burden of establishing the Defendants acted in bad faith in the destruction and recording over of any footage that existed showing the Plaintiff ███████████████. Therefore, without a finding of spoliation, the Court **DENIES** Plaintiff's request for the sanctions of a default judgment or an adverse inference spoliation jury instruction.

## Conclusion

For the reasons stated above, the Court finds that though Defendants did have a duty to preserve video footage from the ███████████████ and failed to comply with such duty, the Plaintiff has not met his burden to show, nor can the Court infer, that the Defendants acted in bad faith. The Court hereby **DENIES** Plaintiff's *Motion to Sanction Defendants for Spoliation of Evidence*.

Dated: 15 APR 2019

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

JAMES F. GRIFFITH
117892
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

David A. Arthur
INDIANA ATTORNEY GENERAL
David.Arthur@atg.in.gov

Joshua Robert Lowry
INDIANA ATTORNEY GENERAL
joshua.lowry@atg.in.gov